44 341
f217 ²533

## The Commonwealth *ex rel.* Yard *versus* Meeser.

*Quo Warranto granted on application of Citizen to test Right of Person claiming a Seat in City Councils of Philadelphia; but the Regularity of the Election will not be inquired into by Supreme Court.*

1. The Supreme Court, on the petition of a private citizen, will grant a writ of *quo warranto* to test the right of a member of the Common Council of a city to a seat in that body.

2. Where the claim is based on the alleged fact that the ward from which the claimant was returned, already represented by one, is entitled to two members, as having four thousand taxable inhabitants, it must appear that it had that number of taxables in the preceding year; and where the list of taxables returned to the commissioner's office with the assessment-book in the previous year, omitting names erased, did not contain that number, and especially where no proclamation for an election for that office was made by the sheriff, and but five votes were cast for the claimant: *Held*, that sufficient cause existed for the allowance of the writ.

3. The Supreme Court cannot inquire whether the election was regularly conducted; for that duty belongs to the branch of councils in which the seat is claimed; but they can decide the question whether there was an office or vacancy to be filled.

THIS was an application to the Supreme Court by Henry E. Wallace and Edmund S. Yard, for a writ of *quo warranto*, based upon the following suggestion :—

Henry E. Wallace and Edmund S. Yard, citizens and qualified voters of the Fifth Ward of the city of Philadelphia, who sue in this behalf, as well for the Commonwealth of Pennsylvania, this 21st day of February 1863, come into court here, and for the said Commonwealth, give the court here to understand and be informed, that William Meeser, since the 5th day of January last, has exercised, and still does exercise, the office,.franchises, rights, and privileges of a member of the Common Council of the city of Philadelphia, for the Fifth Ward of said city, under the circumstances and in the manner following, viz. :—

By an Act of Assembly passed March 21st 1861, it was enacted, " That each ward of the city of Philadelphia shall have a member of Common Council for each two thousand of taxable inhabitants that it shall contain, according to the list of taxables for the preceding year," &c.

According to the lawful list of taxables for the year preceding the last election, on the 14th day of October 1862, said Fifth Ward had less than four thousand taxable inhabitants, and of course said ward was only entitled to one member of Common Council; and as one William M. Baird, who was elected member of said council from said ward, on the second Tuesday of October 1861, held for two years, and was of course still sitting as member for said Fifth Ward, said ward was entitled to elect no other member of said council at said election, on the 14th day

[Commonwealth *v.* Meeser.]

of October 1862; and the sheriff's proclamation, published according to law, prior to the said election, indicated that no election for a member of Common Council was to take place in said ward. Accordingly, both parties withdrew their candidates, or none were put forward or voted for in the usual manner by either party, there being a common understanding in accordance with said proclamation. On counting the votes, however, after the polls had closed, it was found that five votes had been cast by some persons for said William Meeser; said votes were returned as cast or voted, and a certificate was fraudulently given by a majority of the judges of the said ward, certifying that said Meeser was duly elected a member of Common Council from said ward, having received all the votes cast for that office, which certificate, he, the said Meeser, fraudulently received and used at the organization of councils, and the same was, by the officers organizing said councils, fraudulently received, and he, the said Meeser, was by said officers fraudulently permitted to take his seat in said councils, by virtue of said certificate; and he, the said Meeser, has, for the time aforesaid, held and used, and still does hold and use, the said office, franchises, rights, and privileges aforesaid of member of Common Council for said city, from said Fifth Ward, and has usurped and does usurp on the Commonwealth therein, to the great damage and prejudice of the constitution and laws thereof.

Whereupon the said relators for the said Commonwealth make suggestion and complaint of the premises, and pray due process of law against the said William Meeser in this behalf, to be made to answer to the said Commonwealth by what warrant he claims to have, use, and occupy the franchises, rights, and privileges aforesaid.

On hearing, the court awarded the writ, and filed of record the following opinion, which was delivered, February 28th 1863, by

Lowrie, C. J.—It would be a vicious rule of law that would allow all public officers to be annoyed by a *quo warranto* at the pleasure of every intermeddler or malicious person, and therefore we have hesitated in granting this writ at the suit of a private person. But it is quite apparent that the relator here really represents a large and respectable political party, and is not induced to act by mere personal motives. And we observe that by the Act of 24th April 1854, § 3 (not cited to us in arguing these disputes, and not before noticed by us), any tax-payer may obtain an injunction against any violation of the charter law of the city, and we may take this as a fair analogy for granting this writ, especially as we can always prevent the abuse of it by the exercise of the discretion that belongs to all prerogative writs.

Yet it is not without some hesitation that we pass this objection, and come to the essential question of the case.

Is there a reasonable cause shown for disputing the defendant's title to the office of common councilman? We think there is. It is denied that there was any vacancy to be filled for the Fifth Ward at the time of the last election, and this appears to be well founded; for it does not appear that the ward had four thousand taxable inhabitants on the list of taxables of the preceding year, and the sheriff issued no proclamation for an election for the office, and therefore the people did not understand that there was to be an election for it, and only five of them out of nearly four thousand taxables voted.

This ward has already one member, and is not entitled to another unless it had four thousand taxable inhabitants. Here, then, are the regular steps to a valid election: an official list of taxables of the preceding year, showing four thousand taxable inhabitants; a proclamation of the sheriff of a vacancy to be filled, which proclamation is expressly required, and an actual election in pursuance thereof, conducted by the proper officers, and certified as the law directs. If any of these steps are wanting, then the election was irregular, and the defendant's title to the office is at least doubtful. But let us be careful here. This court has no authority to judge whether the election was regularly conducted or not, for that duty is assigned by law to the councils. Our duty must be confined to the decision of the question whether there was an office or vacancy to be filled.

Was there a vacancy in the representation of the Fifth Ward that could lawfully be voted for at that election? Was there the competent number of taxable inhabitants? The relator relies on the record to show that there was not, and the defendant appeals to oral evidence that there was. One sticks to the letter and form of the proceeding, and the other appeals to the spirit and substance of it. How shall we dispose of this appeal?

No doubt there are very many cases in which a strict adherence to the letter of the law would be destructive of justice, and it is quite impossible for the law to define with precision all the customary rights of a people, or to express exactly the duties arising from the ever-changing forms of social transactions. There is a very large field of social relations wherein the law, whether statutory or customary, must ever remain somewhat indefinite, in order to be adapted to society.

But is it so with our election laws? We think not. All our electoral rights depend on written law, and it only can define them. It is true that written law depends itself on ulterior principles of natural law; but those principles are subject to very great diversities of application, and lack entirely their definiteness, which is an essential quality of law as a rule of common or social conduct. Law is intended to be a definition

of those principles in such form as to fit them for a ready and ordinary use, and to avoid the disputes that necessarily grow out of more general principles.

And nowhere is clear and precise definition more needed than in the laws that relate to the organization of society, and to the maintenance of its organic forms.   Form is the sole purpose of them, and we must view them formally and follow them strictly, else the whole society is very apt to be disturbed.   No latitude or looseness of administration of the law is tolerable when it endangers the peace and order of society.   It ought to be so steady as not to be at all shaken by partisan excitements.

The defendant thinks that his ward is entitled to two members of council, if it has in fact four thousand taxable inhabitants.   But this is not the law.   It is that it is so entitled only in case it has so many " according to the list of taxable inhabitants for the preceding year."   Their representation is, therefore, not according to taxables, but according to the inhabitants actually taxed, and placed on a particular list as taxed.   All taxables *ought* to be on that list; but the right depends not on this, but on the fact that they *are* so.

What is the list of taxables ?   Under the Charter Act of 1854, and no doubt long before, this was no other than what is usually called the assessment-book.   But in the supplement of 13th May 1856, § 6, this is changed in a way that may cause some uncertainty, unless care be taken.   It requires the assessors to make out, of course from the assessment-book, " an alphabetical list of all the taxables, to be returned to the commissioners with the assessment-book, to be used for election purposes."   This, then, is the list by which the representative number is to be ascertained, and we must take it as we find it returned into the commissioner's office, by the joint act of assessors, and by it the sheriff must be guided in proclaiming the number of common councilmen to be elected in each ward.   For election purposes it is a record.

Many names in the tax list of the ward, of the year 1861, are erased by red ink lines drawn through them, and they must, for the fixing of the representative number, stand as now written there.   Only what are left appear to be the joint act of the assessors.   If any one has fraudulently erased them, let him be punished for it by refusing him all compensation, or by other penalty.   The erasure rather seems to have been properly done, and it is admitted that the unerased names do not amount to four thousand.   Without speaking, therefore, of the want of the sheriff's proclamation, or of any real election by the people, we think the relator has shown good cause for the writ.

> Rule made absolute, and the writ of *quo warranto* awarded, returnable on the 13th day of March next.